IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| TOTAL QUALITY SYSTEMS, INC., a Utah Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSAL SYNAPTICS CORPORATION, a Utah Corporation,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 1:22-cv-00167-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

This action stems from the deterioration of a longstanding business relationship between two Utah-based defense contractors, Plaintiff Total Quality Systems, Inc. (TQS) and Defendant Universal Synaptics Corporation (Universal).  Universal terminated the parties' former partnership and now competes with TQS for the sale and delivery of a complex testing solution for military aircraft, prompting TQS to file this action.[1]  Now before the court is Universal's Motion to Dismiss, which seeks dismissal of TQS's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]  For the reasons explained below, Universal's Motion is GRANTED IN PART and DENIED IN PART.

---

[1] Dkt. 1, *Complaint* ¶¶ 1–3.

[2] Dkt. 12 at 1.

# BACKGROUND

## I.      Factual Background[3]

TQS and Universal worked together for many years to sell a complex fault detection solution to the U.S. military—the Intermittent Fault Detection and Isolation System (IFDIS).[4] IFDIS combines a standalone system developed by Universal, the Intermittent Fault Detector (IFD), with several components purportedly selected and engineered by TQS.[5]  The resulting solution monitors certain military aircraft systems—known as avionics—under artificial stressors of combat flight to more accurately detect electronic faults that appear during operation but are then undetectable after the aircraft has landed.[6]  TQS claims the testing capability of IFDIS allows more efficient location and correction of elusive defects in avionics without requiring replacement of whole units—thereby saving millions of taxpayer dollars.[7]

But the parties' decades-long partnership took a nosedive amid allegations of breached contracts, late payments, and misconduct by their leadership.[8]  Now TQS alleges Universal misappropriated its proprietary IFDIS knowledge and technology to "cut TQS out and directly offer a Universal IFDIS solution to the U.S. Government," while "lodging a public campaign to

---

[3] Because this case is before the court on a motion to dismiss, it accepts as true all well-pleaded factual allegations contained in the Complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[4] Dkt. 1 ¶¶ 22–23, 31–42.

[5] *Id.* ¶¶ 20–23, 27.

[6] *Id.* ¶¶ 22–23, 33.

[7] *Id.* ¶¶ 30, 33–35.

[8] *Id.* ¶¶ 46–75; *see also* Dkt. 12, *Universal's Motion to Dismiss* (Exhibit 5: Correspondence) at 72–75 (reflecting Universal's position that the parties' relationship was terminated because of "TQS's continued breaches of good faith and fair dealing," delinquent payments, and "[p]oor program management").

discredit and defame TQS's reputation, credibility, and capacity."[9]  Universal counters that it—not TQS—developed IFDIS and that TQS was relegated to supplying "various components of the systems and . . . administrative tasks associated with the [federal] contract[s]."[10]  It frames "TQS [as] nothing more than a disgruntled former business partner that is disappointed [] Universal has moved on."[11]

Notwithstanding the parties' current dispute, the early origins of their partnership are generally uncontested.  In the mid-1990s, Universal developed and later patented the IFD.[12]  Around the same time, TQS received a Small Business Innovation Research (SBIR) contract from the U.S. military to develop a prototype for supporting "fault diagnostic procedures" for military aircraft.[13]  As part of the SBIR contract, TQS decided to use Universal's newly developed IFD along with other components,[14] which culminated in a business relationship between the two companies.[15]  This is where the parties' narratives begin to diverge.

Because the court is considering a motion to dismiss, TQS's factual allegations are the focus here.  At this stage, the court "accept[s] all well-pleaded factual allegations in [TQS's] complaint as true, and . . . view[s] them in the light most favorable to the nonmoving party."[16]

---

[9] Dkt. 1 ¶ 46.

[10] Dkt. 12 at 5–6, 21–24.

[11] *Id.* at 9.

[12] *Id.* at 5; Dkt. 1 ¶ 2 (discussing TQS's decision to work with a "newly developed commercial fault detection subsystem developed by Universal").

[13] Dkt. 1 ¶ 21.

[14] *Id.* ¶ 22.

[15] *Id.* ¶¶ 25, 30–34.

[16] *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (internal quotation marks, alterations, and citations omitted)).

TQS tells the story of an enterprising, veteran-founded company that developed an effective testing solution for military avionics, using a combination of proprietary and commercial off-the-shelf technology.[17]  While TQS decided to use Universal's IFD as part of the IFDIS, it "put the entire system together using its own proprietary knowledge, software, and system design."[18]  TQS's solution merged the constant fault detection capabilities of Universal's IFD with the extreme vibration and thermal stressors of combat flight to produce more accurate fault detection for military application.[19]  Simply put, "[t]he IFDIS did not physically exist before TQS designed, built, and delivered the IFDIS to the U.S. Air Force."[20]

As a result of TQS's efforts, the IFDIS solution was approved by the U.S. government, leading to follow-on contracts for further development and delivery of the IFDIS.[21]  Over the next decade or so, TQS became known as an SBIR "success story" for its achievements with the IFDIS,[22] and continued to work with Universal to develop and commercialize the technology. The parties eventually formalized their relationship under two consecutive agreements—the 2012 Teaming Agreement and 2017 Teaming Agreement—wherein TQS would contract directly with the U.S. government for IFDIS requests and Universal "would sell and provide support for the IFD unit . . . to TQS."[23]  TQS avers these teaming agreements contained exclusivity provisions requiring close collaboration and mutual agreement between the parties for all IFDIS-

---

[17] Dkt. 1 ¶¶ 11–26.

[18] *Id.* ¶ 22.

[19] *Id.* ¶ 23.

[20] *Id.* ¶ 28.

[21] *Id.* ¶¶ 25, 30.

[22] *Id.* ¶ 33 (citing https://www.sbir.gov/node/828785).

[23] *Id.* ¶¶ 31–39; *see also* Dkt. 1-2, *Exhibit 1 to the Complaint: 2017 Teaming Agreement*.

related proposals, whether commercial or government.[24]  Additionally, the agreements protected

both parties' proprietary contributions to the IFDIS, whether Universal's IFD or TQS's own

proprietary knowledge and technology.[25]

   But before the 2017 Teaming Agreement was terminated, Universal started flying solo.[26]

TQS avers, "Universal unilaterally developed agreements with other companies to sell TQS's

hijacked IFDIS system to companies such as Lockheed Martin, Barfield, and/or Star Aviation."[27]

It also started to contract directly with the U.S. government, effectively cutting TQS out of the

parties' lucrative contracting IFDIS pipeline.[28]  At the same time, Universal further breached the

parties' 2017 Teaming Agreement by withholding IFDIS- and IFD-related contracts from TQS.[29]

   TQS claims that Universal's offenses went beyond mere contract breach.  It alleges that

Universal sought to "defame TQS and drive TQS's partners and customers away . . . [with] an

all-out and defamatory campaign against TQS, taking bolder steps at each turn."[30]  In particular,

Universal provided false or misleading statements to U.S. government contracting officials about

TQS's capabilities and continued to downplay TQS's role with the development and delivery of

the IFDIS.[31]  Moreover, Universal sent a letter to TQS's Board of Directors and shareholders

---

[24] Dkt. 1 ¶¶ 31, 39.

[25] *See id.* ¶¶ 36–38; *see also* Dkt. 1-2 § 17.

[26] Dkt. 1 ¶¶ 46–48.

[27] *Id.*

[28] *Id.* ¶¶ 46, 67–68.

[29] *Id.* ¶¶ 48, 68.

[30] *Id.* ¶¶ 46, 69.

[31] *Id.* ¶¶ 51–75.

containing false statements of fact and questioning the company's leadership.[32]  Yet, even as

Universal sought to disparage TQS and "falsely solidify itself as the inventor and market leader

of IFDIS,"[33] it continued using TQS's trade secrets to supplant its former business partner.[34]

## II.   Procedural History

Given the contentious breakdown of the parties' relationship and later actions by

Universal, TQS "now seeks to hold [Universal] accountable" by filing this action.[35]  It brings

one federal claim for misappropriation of trade secrets under the Defend Trade Secrets Act

(DTSA), 18 U.S.C. § 1836(b) (Count IV),[36] and five pendant state claims.[37]  TQS responded

with the instant Motion, seeking dismissal of all six claims pursuant to Rule 12(b)(6).[38]

Universal's Motion has been fully briefed,[39] oral argument was heard on June 1, 2023,[40] and the

matter taken under advisement.

---

[32] *Id.* ¶¶ 58, 73.

[33] *See id.* ¶ 69.

[34] *See id.* ¶¶ 92–119.

[35] *See id.* ¶ 75.

[36] *Id.* ¶¶ 92–106.

[37] TQS brings state claims for (1) intentional interference with economic relations (Count I), *id.* ¶¶ 76–79; (2) breach of contract (Count II), *id.* ¶¶ 80–85; (3) defamation (Count III), *id.* ¶¶ 86–91; (4) trade secret misappropriation under the Utah Uniform Trade Secrets Act (UTSA), Utah Code § 13-24-1 (Count V), *id.* ¶¶ 107–19; and (5) common law unfair competition (Count VI), *id.* ¶¶ 120–23.

[38] Dkt. 12 at 1.

[39] *See id.*; Dkt. 17, *TQS's Memorandum in Opposition to Universal's Motion to Dismiss*; Dkt. 19, *Universal's Memorandum in Support of Motion to Dismiss*.

[40] *See* Dkt. 20, *Minute Entry for Proceedings on June 1, 2023.*

## LEGAL STANDARDS

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[41]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42]  When determining whether a complaint meets these criteria, the court "accept[s] all well-pleaded factual allegations in the complaint as true, and . . . view[s] them in the light most favorable to the nonmoving party."[43]  Although a complaint "need not provide 'detailed factual allegations,' it must give just enough factual detail to provide 'fair notice of what the . . . claim is and the grounds upon which it rests.'"[44]  However, the court will not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[45]  The court is required to "draw on its judicial experience and common sense" to evaluate whether the well-pled facts state a plausible claim for relief.[46]

## ANALYSIS

Universal moves to dismiss all of TQS's claims.  For the reasons stated below, the court DENIES Universal's Motion to Dismiss TQS's claims for breach of contract, trade secret misappropriation, intentional interference with economic relations, and defamation.  However,

---

[41] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

[42] *Id.* (citing *Twombly*, 550 U.S. at 556).

[43] *Sinclair*, 989 F.3d at 765 (internal quotation marks, alterations, and citations omitted).

[44] *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Twombly*, 550 U.S. at 555).

[45] *Iqbal*, 556 U.S. at 678.

[46] *Id.* at 679.

the court GRANTS Universal's Motion to Dismiss TQS's claim for common law unfair competition on preemption grounds.

## I.   Breach of Contract (Count II)

Universal first moves to dismiss TQS's breach of contract claim as "defective on its face."[47]  Under Utah law,[48] "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[49]  "[T]o properly state a claim for a breach of contract, a party must allege sufficient facts, which [this court] view[s] as true, to satisfy each element."[50]  TQS has met this burden.

First, TQS sufficiently pleads the existence of the parties' 2017 Teaming Agreement.[51] Second, TQS alleges it performed under the 2017 Teaming Agreement, including paying Universal its designated share of gross billings received for testing and repair services.[52]  Third, TQS avers Universal breached the 2017 Teaming Agreement by (1) violating the parties' non-disparagement clause; (2) refusing to share unilateral IFDIS contracts with TQS; and (3)

---

[47] Dkt. 12 at 7, 16.

[48] A federal court exercising supplemental jurisdiction over state law claims applies the choice of law rules of the forum state. *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999).  Thus, this court applies Utah choice of law rules.  In contract disputes, Utah courts apply "the law chosen by the parties if they have made an effective choice."  *See Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 188 (Utah 1996) (quoting Restatement (Second) of Conflict of Laws § 205 cmt. b).  Here, the parties made an effective choice that Utah law governs any disputes arising out of the 2017 Teaming Agreement.  *See* Dkt. 1-2 § 30.

[49] *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (citation omitted).

[50] *Id.* (citation omitted).

[51] *See* Dkt. 1 ¶¶ 37–39, 81; *see also* Dkt. 1-2.

[52] *See* Dkt. 1 ¶¶ 38, 82.

violating the parties' exclusivity arrangement for certain IFDIS contracts.[53]  Finally, TQS

contends these breaches caused it to suffer general and consequential damages.[54]

While Universal does not dispute TQS has at least articulated the required elements of a

breach of contract claim, it argues "TQS['s] allegations are nothing more than legal conclusions

that contradict the plain terms of the 2017 Teaming Agreement."[55]  Therefore, Universal asserts

TQS's breach of contract claim falls short of Rule 12(b)(6)'s plausibility standard.[56]  In

particular, Universal points out that the 2017 Teaming Agreement does not contain a non-

disparagement provision[57] and challenges TQS's reading of the parties' purported exclusivity

arrangement.  It argues the allegedly breached exclusivity provision, Section 12, "simply means

. . . that in the event Universal and TQS elect to jointly submit a proposal to a customer, the

parties agree to jointly determine the form and content of that proposal."[58]  "Had the parties

intended to make their relationship exclusive," Universal maintains "they would have included

terms that expressly stated that intent."[59]  As a final matter, Universal argues the 2017 Teaming

Agreement does not contain any requirement that it hand over unilateral, out-of-scope IFDIS- or

IFD-related contracts to TQS on demand.[60]

---

[53] *See id.* ¶¶ 48–75, 83.

[54] *See id.* ¶ 85.

[55] Dkt. 12 at 15.

[56] *See id.*

[57] *Id.* at 17.

[58] *Id.* at 18 (discussing Dkt. 1-2 § 12).

[59] *Id.*

[60] *See id.* at 20.

"Generally, the sufficiency of a complaint must rest on its contents alone."[61]  However, the court may consider documents referred to in the complaint if they "are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."[62]  Because TQS attached an undisputed copy of the parties' 2017 Teaming Agreement to its Complaint, which is central to its breach of contract claim, the court can properly consider the agreement without exceeding the scope of Rule 12(b)(6).  In deciding whether Universal breached the 2017 Teaming Agreement, however, "the legal effect [of the agreement] is to be determined by its terms rather than by the allegations of the pleader."[63]  "This means that, although we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff, if there is a conflict between the allegations in the complaint and the content of the attached exhibit, the exhibit controls."[64]

TQS's breach of contract claim centers on the alleged breaches of the parties' exclusivity arrangement and responsibility to provide copies of IFDIS or IFD-related contracts.[65]  However, the parties dispute whether the agreement actually contains these requirements,[66] and the plain

---

[61] *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

[62] *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)); *see also Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." (citations omitted)).

[63] *Droppleman v. Horsley*, 372 F.2d 249, 250 (10th Cir. 1967) (quotations omitted); *see also Jacobsen*, 287 F.3d at 941 ("[I]n deciding a 12(b)(6) motion, the legal effect of the [attached documents] are determined by the [documents] themselves rather than by allegations in the complaint." (citing *Droppleman*, 372 F.2d at 250)).

[64] *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017).

[65] *See* Dkt. 1 ¶ 83 (discussing the grounds for TQS's breach of contract claim).  While TQS also maintains Universal breached a non-disparagement provision, Universal argues that no such provision exists.  *See* Dkt. 12 at 17.  At oral argument, TQS appeared to concede that point, and the court does not address it here.

[66] *Compare* Dkt. 1 ¶ 39 (reflecting TQS's position that "the 2017 Teaming Agreement . . . contained an exclusivity requirement"), *with* Dkt. 12 at 17–19 ("The 2017 Teaming Agreement does not contain a provision requiring exclusivity between TQS and Universal.").

text does not appear to resolve their divergent readings.  For example, Section 2 expressly limits applicability "[t]o the extent the parties *elect to* work together on a given contract,"[67] consistent with the recitals' recognition that "there may be situations where both [p]arties independently contract with a customer."[68]  But other provisions seem to contemplate obligatory collaboration between the parties—at least regarding IFDIS contracts.[69]  Section 12, the provision Universal allegedly breached,[70] states, without limitation, that the "[p]arties together *shall* decide the form and content of all IFDIS related proposals submitted to the customer whether commercial or government."[71]  Therefore, while the agreement's "legal effect is . . . determined by its terms rather than by [TQS's] allegations,"[72] the language of the agreement does not provide enough clarity to preclude TQS's breach of contract claim at this stage.[73]

  As an alternative basis for dismissing TQS's breach of contract claim, Universal contends TQS failed to allege compliance with an express condition precedent to enforcement of the contract, as required by Rule 9(c).[74]  In relevant part, Section 26 of the 2017 Teaming

---

[67] Dkt. 1-2 § 2 (emphasis added).

[68] *Id.* at 2.

[69] *See, e.g.*, *id.* §§ 4 ("During all phases, contacts or discussions with potential customers will be coordinated between the Parties.  Under all USG contracts, as agreed under this Agreement, TQS will serve as the IFDIS system integrator providing system hardware and software, except for the IFD hardware and software."), 7 ("Both Parties shall coordinate any IFDIS/IFD marketing strategies with each other."), 12 ("The Parties together shall decide the form and content of all IFDIS related proposals submitted to the customer whether commercial or government.").

[70] *See* Dkt. 1 ¶¶ 39, 83.

[71] Dkt. 1-2 § 12 (emphasis added).

[72] *Jacobsen*, 287 F.3d at 941.

[73] *See Thompson v. Wash. Nat'l Ins. Co.*, No. 2:14-cv-00660-DN, 2015 U.S. Dist. LEXIS 164484, at *12 (D. Utah Dec. 8, 2015) ("When a contract is ambiguous, a motion to dismiss is not proper."); *see also Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 15, 133 P.3d 428 ("A contract may be ambiguous because it is unclear, it omits terms, or the terms used to express the intention of the parties may be understood to have two or more plausible meanings." (internal quotation marks and citation omitted)).

[74] *See* Dkt. 12 at 20–21 (citing Fed. R. Civ. P. 9(c)).

Agreement states that before pursuing legal recourse, the "[p]arties each agree to first contact each other with any disputes and provide a written description of the problem, relevant documents and . . . the proposed resolution."[75]   While TQS did not aver compliance with these specific preconditions, it stated that it "fully performed all of its obligations under the 2017 Teaming Agreement."[76]   TQS maintains this statement "encompasses TQS's numerous dispute-resolution attempts, communicated in writing to [Universal], before filing this lawsuit."[77]

While TQS's allegation of compliance lacks specificity, Rule 9(c) pleading requirements are not particularly onerous.[78]   "[I]t suffices to allege generally that all conditions precedent have occurred or been performed,"[79] as TQS has done here.[80]   Accordingly, the court declines to dismiss TQS's breach of contract claim for failing to comply with the requirements of Rule 9(c). To the extent Universal seeks to dispute the adequacy of TQS's notice under that section, it "must do so with particularity."[81]   And this contention "is inappropriate for resolution at the Motion to Dismiss stage,"[82] where the court's function is generally limited to determining whether TQS's Complaint alone is sufficient to state a claim for which relief may be granted.[83]

---

[75] Dkt. 1-2 § 26.

[76] Dkt. 1 ¶ 82.

[77] *See* Dkt. 17 at 9.

[78] *See* Fed. R. Civ. P. 9(c).

[79] *Id.*

[80] *See* Dkt. 1 ¶ 82.

[81] Fed. R. Civ. P. 9(c).

[82] *See Bardill v. Owners Ins. Co.*, No. 18-cv-03319-CMA-SKC, 2019 U.S. Dist. LEXIS 168553, at *16 (D. Colo. Sep. 30, 2019).

[83] *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) ("The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." (internal quotation marks and citation omitted)).

In sum, TQS's allegations concerning breach of contract collectively state a plausible claim for relief under Utah law.  Moreover, TQS's claim that it performed "all of its obligations under the 2017 Teaming Agreement" encompasses the express conditions precedent to enforcement under Section 26.[84]  Universal's Rule 12(b)(6) challenge to TQS's breach of contract claim is therefore denied.

## II.   Trade Secret Misappropriation (Counts IV and V)

Universal next moves to dismiss TQS's state and federal claims for trade secret misappropriation.[85]  The elements of a claim for trade secret misappropriation under the DTSA and UTSA closely resemble each other.[86]  To establish a claim under the DTSA, a plaintiff must show:

> (1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means.[87]

Relatedly, the UTSA requires showing "'(1) the existence of a trade secret, (2) communication of the trade secret to [the defendant] under an express or implied agreement limiting disclosure of the secret, and (3) [the defendant's] use of the secret that injures [the plaintiff].'"[88]

---

[84] *See* Dkt. 1 ¶ 82.

[85] *See* Dkt. 12 at 21–24.

[86] *See Applied Predictive Techs., Inc. v. Marketdial, Inc.*, No. 2:19-cv-00496-JNP-CMR, 2020 U.S. Dist. LEXIS 221981, at *62 (D. Utah Nov. 25, 2020).

[87] *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1175 (D. Colo. 2019) (citation omitted).

[88] *Applied Predictive Techs.*, 2020 U.S. Dist. LEXIS 221981, at *62–63 (quoting *Water & Energy Sys. Tech, Inc. v. Keil*, 1999 UT 16, ¶ 9, 974 P.2d 821).

TQS alleges Universal obtained its trade secrets over the course of the parties' decades-long arrangement.[89]  These trade secrets relate to the "expert engineering and integration of the [IFDIS], and some of the custom components and commercial off-the-shelf modifications" of the complex test system,[90] which meets the definition of "trade secret" under the DTSA and UTSA.[91]  TQS avers this proprietary information—developed at the expense of many years and millions of dollars—was protected by numerous safeguards, including the parties' 2017 Teaming Agreement and "password protecting software programs."[92]  Yet, despite these measures, Universal purportedly "accessed TQS's IFDIS Control Computer, and SBIR software and documents therein, . . . without TQS's approval or knowledge."[93]  It then allegedly used TQS's trade secrets to supplant its former business partner and become the new prime source for IFDIS technology.[94]  In particular, TQS contends "Universal . . . was able to perform on improperly

---

[89] *See* Dkt. 1 ¶¶ 35–49, 96, 109 (discussing TQS's development of the IFDIS "over many years" and the ways Universal was given limited access to the trade secrets before using "its relationship with TQS to steal TQS's [t]rade [s]ecrets").

[90] *Id.* ¶ 35.

[91] The DTSA defines "trade secret" to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  Under the UTSA, a "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Utah Code § 13-24-2(4).

[92] *See* Dkt. 1 ¶¶ 37, 94, 108.

[93] *See id.* ¶ 49.

[94] *See id.*  ¶¶ 96–102, 109–115.  These allegations correspond to the DTSA and UTSA definitions of "misappropriation," which encompass "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means," such as misrepresentation or a breach of a duty to maintain secrecy, "to acquire knowledge of the trade secret."  18 U.S.C. § 1839(5)(B)(i), 6(a); Utah Code § 13-24-2(1), (2)(b).

awarded IFDIS-related contracts to build and provide IFDIS [SRU Interface Test Adapter (ITA) Assemblies] . . . even though [it] had not built or delivered IFDIS ITAs before."[95]

While TQS's allegations sufficiently state a claim for relief under the DTSA and UTSA, Universal contends TQS falls short of meeting the plausibility standard of Rule 12(b)(6).[96]  It urges the court to consider two documents attached as exhibits to its Motion to Dismiss: a 1998 patent for the underlying IFD technology and a 2017 non-disclosure agreement between the parties.[97]  Universal maintains these documents "completely undermine" TQS's trade secret misappropriation claims by establishing that Universal owns the relevant technology for IFDIS, thereby rebutting TQS's claimed trade secrets.[98]

By bringing the 1998 patent and 2017 non-disclosure agreement to the fore, Universal does not challenge the sufficiency of TQS's pleadings so much as attack the merits of its claims. Although these questions might be appropriate at later stages of this litigation, they are not proper now, when the court's inquiry is effectively limited to the sufficiency of TQS's claims.[99]

As prefaced above, a court may properly consider documents attached to or referenced in a complaint,[100] "but consideration of material[s] attached to a motion to dismiss requires the court to convert the motion into one for summary judgment and afford the parties an opportunity

---

[95] *See* Dkt. 1 ¶ 101.

[96] *See* Dkt. 12 at 7, 21–24.

[97] *Id.* (Exhibit 1: 1998 Patent) at 35–52; (Exhibit 3: Mutual Proprietary Information and Nondisclosure Agreement) at 65–68.

[98] *See id.* at 7–8.

[99] *See Dubbs*, 336 F.3d at 1201.

[100] *See supra* Section I.

to present relevant evidence."[101]  The Tenth Circuit Court of Appeals urges caution whenever

new documents are presented at the motion to dismiss stage, as "dismissing a [p]laintiff's claim

using evidence outside the pleadings 'is reversible error unless the dismissal can be justified

without considering the outside materials.'"[102]  Here, the documents Universal urges the court to

consider are perhaps contemplated by the Complaint or the 2017 Teaming Agreement,[103] but

they are hardly "incorporate[d] by reference" or so "central to [TQS's] claim" to warrant

consideration at the motion to dismiss stage.[104]

Upon full consideration of the parties' briefing, the court declines to consider Universal's

proffered evidence because this case is not yet ripe for summary judgment.  The parties have

neither requested conversion of this matter to summary judgment, nor have they completed

discovery.  Moreover, this court "prefers to decide all summary judgment questions in a single

order,"[105] rather than handle piecemeal requests at the motion to dismiss stage.

Universal's case for dismissing TQS's trade secret misappropriation claims ultimately

turns on its alleged ownership of the underlying technology, as purportedly confirmed by its

---

[101] *Firehole River Cap., LLC v. Supurva Healthcare Grp., Inc.*, No. 2:21-cv-00153-DBB, 2021 U.S. Dist. LEXIS 181338, at \*5 (D. Utah Sept. 21, 2021) (citing *Tal v. Hogan*, 453 F.3d 1244, 1264–65 n.24 (10th Cir. 2006)); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

[102] *See Rain Int'l, LLC v. Cook*, No. 2:20-cv-00537-JNP-DBP, 2023 U.S. Dist. LEXIS 24388, at \*7 (D. Utah Feb. 10, 2023) (quoting *GFF Corp.*, 130 F.3d at 1384).

[103] *See, e.g.*, Dkt. 1 ¶¶ 22–37 (discussing the parties' early business relationship and Universal's role with the IFD subcomponent); Dkt. 1-2 at 1 (describing the 2017 non-disclosure agreement as "a separate, stand-alone document").

[104] *See Gee*, 627 F.3d at 1186 (discussing the "quite limited" exceptions to the rule that "[g]enerally, the sufficiency of a complaint must rest on its contents alone").

[105] *See Rain Int'l*, 2023 U.S. Dist. LEXIS 24388, at \*7.

1998 patent and the parties' 2017 non-disclosure agreement.[106]  But the court must accept the

facts as TQS, not Universal, has alleged them.[107]  Based on the detailed factual allegations in the

Complaint, TQS generated some secret proprietary information regarding the "expert

engineering and integration" of the IFDIS that was safeguarded through contractual or other

means.[108]  Yet, Universal managed to circumvent these measures by, among other things,

gaining unauthorized access to TQS's computer systems,[109] before cutting TQS off from future

IFDIS partnerships.[110]  Notwithstanding Universal's strong disagreement, these factual

allegations suffice to state a plausible claim for trade secret misappropriation under the DTSA

and UTSA.  Accordingly, Universal's Rule 12(b)(6) challenge against these claims is denied.

### III.    UTSA Preemption of TQS's Tort-Based Claims (Counts I, III, and VI)

Having found TQS's statutory and contract-based claims sufficient for Rule 12(b)(6)

purposes, the court next considers Universal's challenges to TQS's three tort-based claims: (1)

intentional interference with economic relations (Count I);[111] (2) defamation (Count III); and (3)

common law unfair competition (Count VI).

---

[106] *See generally* Dkt. 12 at 21–24.

[107] *See Sinclair*, 989 F.3d at 765.

[108] *See* Dkt. 1 ¶¶ 35, 94, 108.

[109] *See id.* ¶¶ 49, 96, 109.

[110] *See id.* ¶ 46.

[111] TQS frames its intentional interference claim as a claim for "Intentional Interference with Contracts; Potential Contracts; or Potential Economic Relations."  In *St. Benedict's Development Co. v. St. Benedict's Hospital*, the Utah Supreme Court "adopted the term 'interference with economic relations' as an umbrella term for the torts of intentional interference with contracts and intentional interference with prospective contracts"—a convention that continues today.  *See C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 26 n.48, 437 P.3d 343 (citing *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991)); *see also Zurich Am. Ins. Co. v. Ascent Constr., Inc.*, No. 1:20-cv-00089-DBB, 2022 U.S. Dist. LEXIS 1321, at *12, 22 (D. Utah Jan. 3, 2022) (explaining that claims for tortious interference with existing contracts, existing economic relations, or potential economic relations "are encompassed by a single tort of 'intentional interference with economic relations.'").  Therefore, the court construes Count I as a claim for intentional interference with economic relations.

Universal first argues that TQS's tort-based claims are preempted by the UTSA because they are premised on TQS's allegations of trade secret misappropriation.[112]   In relevant part, the UTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."[113]   However, it does not preempt "other civil remedies that are not based upon a misappropriation of a trade secret."[114]   The Utah Court of Appeals instructs that the UTSA seeks "to preserve a single tort action under state law for misappropriation of a trade secret."[115]   Accordingly, the UTSA preempts a party's claim "to the extent that it is based on factual allegations supporting a [claim for] misappropriation of trade secrets or otherwise confidential information."[116]

To determine whether a given claim is preempted by the UTSA, the court must "review the facts underlying each of [a party's] claims to determine the extent to which each claim is based on misappropriation of information."[117]   If proof of a claim "would . . . simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective [of] whatever surplus elements of proof were necessary to establish it."[118]   However, if a claim is "based upon wrongful conduct independent of the misappropriation of trade secrets or otherwise confidential information, it is not preempted."[119]

---

[112] *See* Dkt. 12 at 24.

[113] Utah Code § 13-24-8(1).

[114] *Id.* § 13-24-8(2)(b).

[115] *CDC Restoration & Const., LC v. Tradesmen Contrs., LLC*, 2012 UT App 60, 274 P.3d 317 (citation omitted).

[116] *Id.*

[117] *Id.* at 331.

[118] *Id.* (citations omitted).

[119] *Id.* (citations omitted).

### A. TQS's Intentional Interference and Defamation Claims Are Not Preempted by UTSA.

TQS's claims for intentional interference and defamation arise out of the second part of Universal's purported strategy—the "public campaign to discredit and defame TQS's reputation, credibility, and capability."[120]  Yet, these claims are not completely unmoored from the allegations of trade secret misappropriation by Universal.  One of TQS's recurring allegations is that Universal falsely claimed sole ownership of IFDIS in communications to TQS's current and prospective customers.[121]  But the UTSA does not necessarily preclude "an entire claim . . . simply because one of the underlying factual allegations is based upon misappropriation of trade secrets or other confidential information."[122]  Rather, Utah law "permits a claim to endure to the extent that the claim relates to conduct independent of the misuse of confidential information."[123]

Although TQS's tort-based claims have some nexus with the alleged trade secret misappropriation by Universal, they ultimately center on the actions Universal took "to defame TQS and drive TQS's partners and customers away."[124]  Among other allegations, TQS avers that Universal prompted a government official to contact one of TQS's leading customers to state that TQS "was not capable" and would "fail" an ongoing IFDIS development contract.[125]  It also alleges Universal provided a letter to the U.S. government questioning, among other things, TQS's "creditworthiness," financial stability, and representations made to various contracting

---

[120] *See* Dkt. 1 ¶¶ 46, 76–79, 86–91.

[121] *See id.* ¶¶ 52, 53, 56, 60, 62, 71, 72.

[122] *Premier Sleep Sols., LLC v. Sound Sleep Med., LLC*, No. 2:20-cv-00062-JNP-JCB, 2021 U.S. Dist. LEXIS 63002, at *18 (D. Utah Mar. 30, 2021) (citing *CDC Restoration*, 274 P.3d at 331).

[123] *Id.*

[124] *See* Dkt. 1 ¶ 50.

[125] *Id.* ¶ 51.

officials.[126]  TQS further claims Universal posted defamatory statements on social media, "effectively [stating] . . . that [TQS] is defrauding the government," while also deriding its former business partner as "predatory."[127]  Although the question of whether Universal misappropriated TQS's trade secrets may be relevant to the veracity of some of these allegedly tortious communications, TQS's intentional interference and defamation claims fundamentally "relate[] to conduct independent of the misuse of confidential information."[128]  In other words, "[t]hese claims stand on their own regardless of whether . . . [Universal] misappropriated . . . [TQS's] trade secrets."[129]

In sum, TQS's intentional interference and defamation claims are both able to stand on their own "without [the] allegations regarding misuse of information" that support TQS's trade secret misappropriation claims.  Therefore, the court declines to dismiss these claims on UTSA preemption grounds.

### B.  TQS's Unfair Competition Claim Is Preempted by UTSA.

In contrast, TQS's unfair competition claim is preempted by the UTSA.  In relevant part, TQS alleges "Universal has passed off and/or palmed off TQS's IFDIS technology as its own," thereby "confusing and deceiving[] TQS's customers."[130]  A close look at the underlying factual allegations of the claim demonstrates a reliance on the very same allegations supporting TQS's trade secret claims—namely, that Universal misappropriated TQS's trade secrets and then

---

[126] *Id.* ¶ 56.

[127] *Id.* ¶ 60.

[128] *See Premier Sleep*, 2021 U.S. Dist. LEXIS 63002, at *18–19.

[129] *See Advanced Recovery Sys., LLC v. Am. Agencies, LLC*, No. 2:13CV283DAK, 2017 U.S. Dist. LEXIS 24001, at *12 (D. Utah Feb. 21, 2017).

[130] Dkt. 1 ¶¶ 121–22.

coopted the lucrative IFDIS contracting pipeline.[131]  The codepence between these claims

chafes against the central preemption goal of UTSA—"to preserve a single tort action under state

law for misappropriation of a trade secret" [132]—and warrants dismissal.

 While TQS seemingly acknowledges the close overlap between its trade secret

misappropriation claims and unfair competition claim, it argues that dismissing the latter would

be premature because it brought "that claim . . . in the event its [UTSA] claim . . . is ultimately

dismissed on summary judgment."[133]  It posits that "it is widely considered appropriate to deny a

motion to dismiss on preemption grounds," where, as here, the movant also challenges the very

existence of a trade secret.[134]  Under these circumstances, TQS maintains that "dismissing the

unfair competition claim . . . could unfairly limit [its] recovery."[135]

 Notwithstanding TQS's desire to keep an otherwise preempted claim available until

summary judgment, this court has shown no qualms about dismissing claims that are preempted

by UTSA at earlier stages of litigation.[136]  Indeed, neither the plain text nor the statutory purpose

of the UTSA contemplates the preemption carveout that TQS urges the court to adopt.  While

this court previously opted not to dismiss claims based on UTSA preemption where the existence

---

[131] *See generally id.* ¶¶ 46–50, 64, 67, 74.

[132] *See CDC Restoration*, 274 P.3d at 331 (citation omitted).

[133] Dkt. 17 at 13–14.

[134] *Id.* at 14 (citing *Callaway Golf Co. v. Dunlop Slazenger Grp. Ams., Inc.*, 295 F. Supp. 2d 430, 437 (D. Del. 2003); *Signature Flight Support, LLC v. Carroll*, No. 7:20-cv-00739, 2021 WL 4352564, at *4–5 (W.D. Va. Sept. 24, 2021)).

[135] *Id.*

[136] *See, e.g.*, *Surgenex, LLC v. Predictive Therapeutics, LLC*, 462 F. Supp. 3d 1160, 1175 (D. Utah 2020) (dismissing claims for unjust enrichment and conversion on UTSA preemption grounds); *MonaVie, LLC v. FVA Ventures, Inc.*, No. 2:12-CV-152 TS, 2012 U.S. Dist. LEXIS 75638, at *8–10 (D. Utah May 30, 2012) (dismissing claims for conversion and intentional interference based on UTSA preemption).

of a trade secret was disputed,[137] later decisions—and further clarification from Utah courts—compel a broader application of the UTSA.[138]  In *Applied Predictive Technologies, Inc. v. MarketDial, Inc.*, this court expressly "reject[ed] . . . [the] argument that it is premature to resolve" preemption arguments at the motion to dismiss stage if it is unclear whether certain confidential information constitutes a trade secret.[139]  Moreover, the Utah Court of Appeals explained that "the UTSA preempts claims based on the unauthorized use of information, irrespective of whether that information meets the statutory definition of a trade secret."[140] These cases contradict TQS's understanding that "it is . . . appropriate to deny a motion to dismiss on preemption grounds"[141] and support dismissal of TQS's claim at this juncture.[142]

Because TQS's unfair competition claim falls squarely within the bounds of UTSA preemption, it must be dismissed.  Accordingly, Universal's Motion to Dismiss TQS's unfair competition claim is granted.

---

[137] *See Novations Grp., Inc. v. Zenger Folkman Co.*, No. 2:06-CV-00347 PGC, 2006 U.S. Dist. LEXIS 105905, at *30 (D. Utah Sep. 8, 2006) ("It is unclear, at least at this point in the litigation, whether the confidential information would necessarily be a trade secret or not, and the court believes that a motion to dismiss [based on] on [UTSA preemption] without further discovery is inappropriate.").

[138] *See Applied Predictive Techs.*, 598 F. Supp. 3d at 1282 n.9. (discussing Utah courts' clarification that UTSA preemption applies to claims concerning even disputed trade secrets).  TQS points to one case where a magistrate judge in this District allowed a claim for unjust enrichment to stand alongside a trade secret misappropriation claim. *See Hark'n Techs., Inc. v. Orange Whip Fitness X, LLC*, No. 1:21-cv-00054-CMR, 2022 U.S. Dist. LEXIS 147702, at *33–35 (D. Utah Aug. 16, 2022).  But the defendant in that case did not raise UTSA preemption as a basis for dismissal, *see* Motion to Dismiss at 30, *Hark'n Techs.*, No. 1:21-cv-00054-CMR (June 9, 2021), ECF No. 30, and the magistrate judge did not discuss it.  In any event, the case does not stand for the sweeping proposition that preempted tort claims should survive at the motion to dismiss stage where the underlying trade secret is challenged.

[139] *Applied Predictive Techs.*, 598 F. Supp. 3d at 1282 n.9.

[140] *See CDC Restoration*, 274 P.3d at 330.

[141] *See* Dkt. 17 at 14.

[142] *Cf. Dubbs*, 336 F.3d at 1201 (explaining that "[t]he court's function on a Rule 12(b)(6) motion is . . . to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted").

## IV.     Intentional Interference (Count I)

In addition to the UTSA preemption argument discussed above, Universal contends TQS's intentional interference claim fails to meet the plausibility standard of Rule 12(b)(6).[143] To state a claim for intentional interference with economic relations under Utah law, a plaintiff must allege "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."[144]

Here, TQS alleges "Universal improperly interfered, and continues to interfere, with [its] contracts and prospective contracts by, among other things, providing false and/or inaccurate information about TQS to [its] customers and potential customers."[145]  It points to numerous communications allegedly made by Universal and its leadership as part of an overarching "campaign to discredit and defame TQS."[146]  TQS avers that Universal's chief executive officer, Ken Anderson, provided a letter to the government falsely stating that TQS had deceived government officials and lacked financial stability.[147]  Additionally, TQS alleges "Universal . . . deliberately interfered with TQS's business base at Hill Air Force Base . . . by falsely convincing them to reverse course and compete a . . . sole-source . . . contract" previously held by TQS.[148]  TQS further asserts that Universal and Anderson undermined TQS's reputation on social media by "effectively communicat[ing] that TQS is defrauding the government."[149]  It maintains these

---

[143] *See* Dkt. 12 at 25–30.

[144] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (citation and emphasis omitted).

[145] Dkt. 1 ¶ 78.

[146] *See id.* ¶¶ 48, 50–74.

[147] *See id.* ¶ 56.

[148] *Id.* ¶ 64.

[149] *See* Dkt. 17 at 14 (citing Dkt. 1 ¶ 60).

"serious and deeply damaging" actions have caused TQS to lose "the opportunity to obtain additional contracts from the U.S. government, costing [it] millions of dollars in revenue which it would have otherwise received."[150]

Universal responds to TQS's allegations with a consolidated salvo directed at both the intentional interference and defamation claims.  While Universal's commingled arguments create some ambiguity regarding which points are specifically directed against TQS's intentional interference claim, it appears Universal generally challenges the second and third elements of TQS's claim: interference by "improper means" and causation.[151]

### A. Improper Means

As prefaced above, TQS must sufficiently allege that Universal's interference was conducted by "improper means."[152]  Utah courts have "narrowly" defined improper means to encompass "only those actions that 'are contrary to law, such as violations of statutes, regulations, or recognized common-law rules' or actions that violate 'an established standard of a trade or profession.'"[153]  "A non-exhaustive list of conduct that may constitute improper means includes 'violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s].'"[154]

---

[150] Dkt. 1 ¶ 79.

[151] *See Eldridge*, 2015 UT 21, ¶ 70 (discussing the required elements of an intentional interference claim).

[152] *Id.*

[153] *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 3, 437 P.3d 343 (Utah 2019) (quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307 (Utah 1982), *overruled on other grounds*, *Eldridge*, 2015 UT 21).

[154] *Smart Surgical, Inc. v. Utah Cord Bank, Inc.*, No. 2:20-cv-00244-JNP, 2021 U.S. Dist. LEXIS 36563, at *6–7 (D. Utah Feb. 25, 2021) (quoting *C.R. England*, 2019 UT 8, ¶ 42)).

Universal's purported "campaign to discredit and defame TQS" and corresponding communications appear to fit within the recognized categories of "deceit or misrepresentation, . . . defamation, or disparaging falsehood[s]."[155]  However, Universal counters that the alleged communications were not necessarily defamatory.[156]  While they may have reflected "sharp criticism" or hard truths, Universal maintains that the underlying claims were true nonetheless, placing them outside the realm of "improper means" and vitiating TQS's intentional interference claim.[157]  To bolster the veracity of the communications' underlying claims, Universal once again invites the court to consider both the 1998 patent and the 2017 non-disclosure agreement.[158]  However, as discussed, the court is generally limited to the contents of the Complaint and must "accept all well-pleaded factual allegations [therein] . . . as true, and . . . view them in the light most favorable to the nonmoving party."[159]  Accordingly, the court declines to cross-reference the veracity of Universal's communications with outside evidence.

Universal also repeatedly challenges whether the communications satisfy the "publication" requirement for a defamation claim under Utah law.[160]  As discussed below, the court agrees that some of the alleged communications fall short of sustaining a defamation claim under Utah law, but there are other possible categories of "improper means"—namely, "deceit or

---

[155] *See id.*

[156] Universal focuses almost entirely on disproving the defamatory nature of the communications, but ignores that there are other permissible categories for "improper means," including "deceit or misrepresentation" and "disparaging falsehood[s]."  *See id.*  This court has explained that "the conduct allegedly constituting improper means must be independently actionable," though it does not necessarily need to be defamatory.  *See John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1329 (D. Utah 2020).

[157] *See* Dkt. 12 at 25–30.

[158] *See id.* at 28.

[159] *Sinclair*, 989 F.3d at 765 (internal quotation marks, alterations, and citations omitted); *see also supra* Section II.

[160] *See* Dkt. 12 at 26–29.

misrepresentation" and "disparaging falsehood[s]," [161] which do not track the same requirements.

For example, the tort of misrepresentation, which "can satisfy the improper means element," occurs when "[a] defendant . . . makes a false statement, concerning 'a presently existing material fact,' and 'induce[s] reliance upon that statement.'" [162]   Here, TQS avers that Universal made false statements about TQS's IFDIS capabilities, credibility, and financial situation as part of an effort to convince the government to move away from TQS. [163]   While these allegations might not support a standalone claim for defamation, they evince "independently tortious or wrongful" conduct by Universal. [164]   Accepting these allegations as true, the court therefore concludes TQS has sufficiently alleged interference by improper means.

### B. Causation

Universal also challenges the third element of TQS's intentional interference claim— injury to the plaintiff. [165]   In relevant part, TQS alleges Universal's actions caused TQS to lose "the opportunity to obtain additional contracts from the U.S. government, costing TQS millions of dollars." [166]   While this allegation is certainly general, the "third element . . . [is] frequently satisfied," [167] and plaintiffs need not "plead the damages with particularity" to survive a Rule

---

[161] *See Smart Surgical*, 2021 U.S. Dist. LEXIS 36563, at *6–7 (quoting *C.R. England*, 437 P.3d at 353).

[162] *Moxtek, Inc. v. United States Welding, Inc.*, No. 2:22-cv-00143-JNP-DAO, 2023 U.S. Dist. LEXIS 37251, at *16 (D. Utah Mar. 3, 2023) (quoting *John Bean Techs.*, 480 F. Supp. 3d at 1329).

[163] *See* Dkt. 1 ¶¶ 50–74.

[164] *See C.R. England*, 437 P.3d at 354 ("[W]e have been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a means that is independently tortious or wrongful.").

[165] Dkt. 12 at 28–30.

[166] Dkt. 1 ¶ 79.

[167] *Big Squid, Inc. v. Domo, Inc.*, No. 2:19-cv-193, 2019 U.S. Dist. LEXIS 131094, at *20 (D. Utah Aug. 5, 2019).

12(b)(6) challenge.[168]  Moreover, the harm alleged by TQS is precisely the type of "gratuitous economic harm" contemplated by the tort of intentional interference with economic relations.[169] Under these circumstances, TQS's general allegation of the harm caused by Universal's conduct satisfies the third element of its intentional interference claim.

In conclusion, the court determines that TQS successfully states a plausible claim for intentional interference with economic relations.  Universal's Rule 12(b)(6) challenge to the claim is therefore denied.

## V.   Defamation (Count III)

As a final matter, the court takes up Universal's Rule 12(b)(6) Motion to Dismiss TQS's defamation claim.[170]  To establish a defamation claim under Utah law, a plaintiff must demonstrate "(1) the defendant published the statements [in print or orally]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages."[171]  The fifth

---

[168] *IHC Health Servs. v. ELAP Servs., LLC*, No. 2:17-cv-01245-JNP-EJF, 2018 U.S. Dist. LEXIS 168459, at *15–16 (D. Utah Sep. 28, 2018) ("[A]lthough IHC has alleged its damages generally, it is not required to plead the damages with particularity."); *see also Procter & Gamble Co. v. Haugen*, 222 F.3d 1262, 1279 (10th Cir. 2000) ("Although in the instant case the allegations are certainly general, 'general factual allegations of injury resulting from the defendant's conduct may suffice' at the pleading stage to state a claim for which relief can be granted." (quoting *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir. 1996) (citation and internal quotation omitted))).

[169] *See Eldridge*, 2015 UT 21, ¶ 57 ("[T]ortious interference law needs flexibility to deal with the new and creative methods people might invent to inflict gratuitous economic harm on each other," which supports "case-by-case efforts to adapt the common law to solve contemporary problems.").

[170] *See* Dkt. 12 at 8, 25–30.

[171] *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 68, 194 P.3d 956 (quoting *DeBry v. Godbe*, 1999 UT 111, ¶ 8, 992 P.2d 979).

element requires a plaintiff to plead special damages, or the loss of something having economic or pecuniary value.[172]

In the present case, TQS contends that two categories of statements by Universal or Anderson are defamatory.[173] First, TQS argues that Anderson's social media posts from 2022— maligning TQS as "predatory," dishonest to the government, and lacking IFDIS capabilities— constitute defamation.[174] Second, TQS points to Universal's September 1, 2022 letter to TQS's Board of Directors and its shareholders, stating, among other things, that TQS "has no role in future [IFDIS] sales, support, training, maintenance, repair or sustainment."[175] Because TQS's defamation claim needs only one of these communications to withstand Universal's Rule 12(b)(6) challenge, the court addresses only the September 1, 2022 letter.

Universal challenges TQS's claim that the letter it sent to TQS's Board of Directors and shareholders constitutes defamation on the basis that it does not fulfill the first element of a defamation claim—publication.[176] Universal argues that "the internal letter . . . was not published to a third party and therefore cannot be actionable as defamation."[177] As the Utah Supreme Court instructs, "[t]he requirement of 'publication' means that the defamatory statement be communicated to a third person and that the third person read and understand the

---

[172] *Porter v. Staples the Office Superstore, LLC*, 521 F. Supp. 3d 1154, 1163 (D. Utah 2021) (citing *Allred v. Cook*, 590 P.2d 318, 320–21 (Utah 1979)).

[173] *See* Dkt. 17 at 15–18.

[174] *See* Dkt. 17 at 15 (citing Dkt. 1 ¶¶ 60, 63, 72, 87).

[175] *Id.* at 15–16 (citing Dkt. 1 ¶ 58).

[176] *See* Dkt. 12 at 30.

[177] *Id.*

statement."[178]  In the corporate context, this court has reasoned that because "management is the corporation for purposes of communication, . . . communication to corporate management of alleged defamation of the corporation does not constitute publication."[179]

Here, TQS alleges Universal sent a defamatory letter to its Board of Directors and "all 80 TQS Shareholders," many of whom do not work for TQS.[180]  It would be a remarkable expansion of this court's jurisprudence that a communication to corporate management does not satisfy the publication requirement to conclude, as Universal urges, that this principle also forecloses communications made to non-management, non-employee shareholders.  The court knows of no authority—and Universal has pointed to none—that gives businesses free reign to target their competitors' shareholders with defamatory, fear-mongering communications on the grounds that such communications lack the necessary element of publication.  The court declines to adopt such a view and concludes that the Complaint sufficiently alleges publication.

While there may be other grounds to dispute that the September 1, 2022 letter constitutes defamation under Utah law, Universal has not addressed them.  Having found that the letter satisfies the required publication element as a pleading matter, the court therefore denies Universal's Motion to Dismiss TQS's defamation claim.

---

[178] *See DeBry*, 992 P.2d at 985.

[179] *Fausett v. Am. Res. Mgmt. Corp.*, 542 F. Supp. 1234, 1241–42 (D. Utah 1982); *see also* 1 Business Torts § 6.02 (discussing Utah's limitation of the publication element in the corporate context).

[180] *See* Dkt. 1 ¶ 58.

## VI.    Leave to Amend

"In the event the [c]ourt perceives any deficiency in the Complaint," TQS "alternatively requests leave to file an amended complaint under Federal Rule of Civil Procedure 15(a)(2)."[181] However, under Rule 15-1 of the Rules of Practice for the United States District Court for the District of Utah, a party seeking leave to amend a pleading must file a motion, which contains both "the proposed amended pleading, and . . . a redlined version of the proposed amended pleading comparing it with the pleading sought to be amended" as exhibits.[182]  TQS's current request does not meet any of these requirements.  While Federal Rule 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires,"[183]  TQS must first comply with the Local Rules' procedures for requesting leave to amend a pleading.[184]  Because TQS has not done so here, the court denies its request.  If TQS still wishes to amend its Complaint, it must seek the consent of Universal or request the court's leave to amend following the procedures set forth by Federal Rule 15(a)(2) and Local Rule 15-1.

---

[181] Dkt. 17 at 22.

[182] DUCivR 15-1.

[183] Fed. R. Civ. P. 15(a)(2).

[184] *Cf. Nahno-Lopez v. Houser*, 625 F.3d 1279, 1284 (10th Cir. 2010) ("Local rules that are consistent with the national rules have the force of law.").

**CONCLUSION**

For the reasons stated herein, the court DENIES Universal's Motion to Dismiss TQS's intentional interference claim (Count I), breach of contract claim (Count II), defamation claim (Count III), and trade secret misappropriation claims (Counts IV and V).  The court GRANTS Universal's Motion to Dismiss TQS's common law unfair competition claim (Count VI). Accordingly, TQS's sixth cause of action is hereby DISMISSED without prejudice.

SO ORDERED this 28th day of June, 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge