IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TOTAL QUALITY SYSTEMS, INC,<br><br>Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>UNIVERSAL SYNAPTICS<br>CORPORATION,<br><br>Defendant/Counterclaim Plaintiff. | **MEMORANDUM DECISION AND ORDER GRANTING TQS'S PARTIAL MOTION TO DISMISS**<br><br>1:22-cv-00167-RJS-DAO<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

This action arises from the deterioration of a business relationship between two Utah-based defense contractors, Plaintiff/Counterclaim Defendant Total Quality Systems, Inc. (TQS) and Defendant/Counterclaim Plaintiff Universal Synaptics Corporation (Universal). Now before the court is TQS's Partial Motion to Dismiss Universal's Amended Counterclaim,[1] seeking dismissal of three of Universal's eleven causes of action.[2]

TQS moves to dismiss Universal's fourth and fifth causes of action for willful patent infringement on the grounds that: (1) Universal's patents-in-suit are invalid under 35 U.S.C. § 101 and (2) the pleadings fail to sufficiently state claims for either infringement or willful infringement.[3] TQS also moves to dismiss Universal's tenth cause of action for defamation either: (1) as time-barred under the statute of limitations or (2) for failure to

---

[1] Dkt. 37, *Plaintiff/Counterclaim Defendant Total Quality Systems, Inc.'s Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)* (*Motion to Dismiss*).

[2] TQS originally sought dismissal of Universal's sixth and seventh causes of action for trade secret misappropriation as well. *Id.* at 3. However, TQS informed the court at the hearing on the Motion to Dismiss that it is abandoning this argument. *See* Dkt. 72, *Minute Entry*. As a result, in this decision the court addresses only the Motion to Dismiss with regards to willful patent infringement and defamation claims.

[3] *Motion to Dismiss* at 1.

adequately state a claim for relief.[4]  For the reasons explained below, TQS's Motion is

GRANTED.  The court dismisses without prejudice Universal's willful patent infringement and

defamation claims.

**BACKGROUND**

I.      **Factual Background[5]**

Military aircraft can suffer from intermittent faults in their electrical systems, which are

difficult to duplicate and isolate.[6]  Because technicians struggle to isolate the source of the faults,

the U.S. military is often forced to conduct more extensive repairs or to replace entirely older

electronic systems to ensure the aircrafts remain functional.[7]  In aggregate, these repairs can cost

billions of dollars.[8]

To solve this problem, in 1987 Brent and Paul Sorensen[9] invented Intermittent Fault

Detection (IFD) technology, which forms the basis of the Intermittent Fault Detection and

Isolation System (IFDIS).[10]  This complex fault detection solution is used by the Air Force,

Navy, and other customers to identify the sources of intermittent faults, avoiding the need to

replace entire electronic systems.[11]  The IFDIS is comprised of five major components: (1) the

IFD; (2) a "[s]hake table to simulate the flight environment;" (3) an "[e]nvironmental chamber to

---

[4] *Id.*

[5] The parties disagree on many facts.  Because this case is before the court on a motion to dismiss, it accepts as true all well-pleaded factual allegations contained in Universal's Amended Counterclaim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2017).

[6] Dkt. 30, *Amended Counterclaim* ¶ 12.

[7] *Id.* ¶¶ 12–13.

[8] *Id.* ¶ 12.

[9] Because Brent and Paul Sorensen share the same last name, the court will use their first names with no disrespect intended by the apparent informality.

[10] *Id.* ¶¶ 7, 38.

[11] *Id.* ¶ 37.

simulate the flight environment;" (4) the "Interface Test Adapter (ITA), a wiring harness that interconnects a Unit Under Test (UUT) to the IFD;" and (5) various other Universal trade secrets.[12]  Once a fault is detected in the UUT by the IFDIS, the precise faulty circuit is reported to the test technician, allowing for targeted repairs.[13]

Brent and Paul founded Universal in 1996 as a vehicle to market and sell their IFD products.[14]  In 2006, Universal and TQS began working together to provide IFDIS services to customers.[15]  Universal developed the IFDIS while TQS "exclusively [provided] repair services for the IFDIS."[16]  Their partnership continued for over a decade.  The final contracts between the two were the 2017 Teaming Agreement and the Operative NDA.[17]  The Operative NDA was a one-way agreement, "govern[ing] TQS's treatment of any confidential information or trade secrets that would be provided by Universal to TQS as part of the 2017 Teaming Agreement."[18]

While their relationship was still productive, Universal and TQS "jointly submitted an SBIR Phase II contract proposal to the U.S. Government to design and manufacture prototype IFDIS Test Program Sets for the Air Force and NAVAIR."[19]

---

[12] *Id.* ¶ 38.

[13] *Id.* ¶ 39.

[14] *Id.* ¶ 17.

[15] *Id.* ¶ 46.

[16] *Id.* ¶ 47.

[17] *Id.* ¶¶ 57, 63.

[18] *Id.* ¶¶ 64–66.

[19] *Id.* ¶ 83.

On December 17, 2018, Universal terminated the 2017 Teaming Agreement.[20]  As part of

the termination, Universal provided TQS with a formal letter.[21]  This letter included a reminder

about the Operative NDA which:

> [P]revented TQS from accessing, using or sharing information relating to (a) the
> IFD and associated software without Universal's consent, (b) the licensed process
> of environmental stimulation to induce an intermittent fault as outlined in the 1998
> and 2012 patents, except on those systems that were delivered under a SBIR
> contract vehicle, and (c) any previously licensed process technology on non-SBIR
> delivered IFD systems.[22]

Universal communicated, "TQS was no longer authorized to provide the IFDIS ITA in

connection with the SBIR [P]hase II contract proposal and demanded that TQS remove the

IFDIS, NODES software, and Universal support from the statement of work."[23]  Universal

warned "any design and manufacturer of the IFDIS ITA, or any other development by TQS

pursuant to this SBIR Phase II contract would constitute infringement of Universal's patent

rights."[24]  Nevertheless, Universal now alleges TQS did not withdraw these sections of the

proposal and the government awarded TQS the contract.[25]

Universal owns several patents related to the IFD and the IFDIS.  In 1998, the United

States Patent and Trademark Office (USPTO) awarded Brent U.S. Patent No. 5,744,967 (the

'967 Patent), which he later assigned to Universal.[26]  "In 2009, Brent filed another patent

application for improvements he made to the IFDIS," and assigned his rights to Universal.[27]  The

---

[20] *Id.* ¶ 72.

[21] *Id.*

[22] *Id.* ¶ 74.

[23] *Id.* ¶ 84.

[24] *Id.*

[25] *Id.* ¶¶ 90, 93.

[26] *Id.* ¶¶ 18, 19.

[27] *Id.* ¶¶ 25, 26.

USPTO awarded U.S. Patent No. 8,103,475 (the '475 Patent) to Universal on January 24, 2012.[28]  In 2018, the Sorensens and two other partners filed a patent application "for further improvements that they made to the IFDIS" and assigned their rights to Universal.[29]  The USPTO awarded U.S. Patent No. 10,641,826 (the '826 Patent) to Universal on May 5, 2020.[30]

In the course of performing the SBIR Phase II contract between December 4, 2019 and August 23, 2021, Universal alleges "TQS improperly used the patented technology claimed in the '475 Patent and the '826 Patent to design and manufacture prototype IFDIS Test Program Sets for the Air Force and NAVAIR."[31]  "By using the Air Force IFDIS to test its prototype ITAs without authorization or license from Universal, and more specifically by using the IFD within the Air Force IFDIS," TQS infringed at least Claims 1 and 8 of the '475 Patent and Claim 12 of the '826 Patent.[32]

Claim 1 of the '475 Patent reads:

1.  An apparatus for testing a system, the apparatus comprising:

a plurality of inputs each adapted to receive a signal from a test point in the system under testing;

a switching module including:

a first output selectively coupled to receive and output one or more of the plurality of inputs; and

a set of outputs excluding the first output and corresponding in number to the plurality of inputs, each of the outputs in the set of outputs being selectively coupled to receive and output a corresponding one of the plurality of inputs;

---

[28] *Id.* ¶ 29.

[29] *Id.* ¶ 31.

[30] *Id.* ¶ 35.

[31] *Id.* ¶ 95.

[32] *Id.* ¶¶ 99–100; *see also* ¶¶ 188–94 (laying out the Fourth Cause of Action for willful infringement of the '475 patent); ¶¶ 195–202 (laying out the Fifth Cause of Action for willful infringement of the '826 patent).

a neural network coupled to the set of outputs of the switching module, the neural network configured to measure electrical characteristics of each of the test points of the system under test at the same time when the set of outputs is selectively coupled to output the plurality of inputs to the neural network; and

a test meter coupled to the first output of the switching module such that the test meter can measure electrical characteristics of the test points when the first output is selectively coupled to output the one or more of the plurality of inputs to the test meter;

wherein when the first output is selectively coupled to output the one or more of the plurality of inputs to the test meter, the switching module is configured to sequentially couple one or more combinations of test points of the system under test to the test meter such that electrical characteristics of a first test point of the combination of test points relative to one or more other test points of the combination of test points is determined.[33]

Claim 8 of the '475 patent reads:

8. An apparatus for testing a system, the apparatus comprising:

at least one row sense line and at least one column sense line;

an array of nodes each receiving a signal from the system under test, wherein each node is electrically coupled to a specific test pin and a switch specific to the node, the nodal switch being electrically coupled to the specific test pin, each of the nodal switches being configured to selectively couple a signal that is alternative to the system under test signal received at the corresponding node to the at least one row sense line and the at least one column sense line;

a circuit coupled to the at least one row sense line and configured to detect the signal coupled to the row sense line; and

a circuit coupled to the at least one column sense line and configured to detect the signal coupled to the column sense line.[34]

Claim 12 of the '826 patent reads:

12. A method of mapping interconnections between connection points in a unit under test (UUT), the method comprising:

accessing a test module comprising at least one UUT, the UUT comprising one or more connection points;

---

[33] Dkt. 37-1, *Exhibit A: United States Patent No. 8,103,475 ('475 Patent)* col. 15 l. 4–34.

[34] *Id.* col. 15 l. 58– col. 16 l. 9.

instantiating a database table with one or more database table entries configured to list connections identified between the connection points, wherein the database table entries are configured to store a resistance level measured at each connection point;

provisioning a switch connected to each connection point to automatically detect interconnections on the UUT, the switches being configured to identify which connection points in the circuit board are electrically connected; and

storing an indication of the identified interconnections in the database table entries, such that the UUT's interconnections are mapped and stored in the database table.[35]

## II.    Procedural History

TQS filed the present action in December 2022[36] and Universal filed its Amended Counterclaim in August 2023, asserting eleven causes of action.[37]  TQS responded with the instant Motion, seeking dismissal of Universal's fourth and fifth causes of action for willful infringement of the '475 and '826 patents and tenth cause of action for defamation under Utah state law.[38]  After the motion was fully briefed,[39] TQS filed a Notice of Supplemental Authority pursuant to Local Rule DUCivR 7-1(c)[40] and Universal responded.[41]  Universal filed an additional Notice of Supplemental Authority.[42]  Oral argument was heard on April 23, 2024,[43] and the matter taken under advisement.

---

[35] Dkt. 37-2, *Exhibit B: United States Patent No. 10,641,826* (*'826 Patent*) col. 13 l. 44–col. 14 l. 7.

[36] Dkt. 1, *Complaint*.

[37] *Amended Counterclaim*.

[38] *Motion to Dismiss* at 3.

[39] *See id.*; Dkt. 44, *Defendant/Counterclaim Plaintiff Universal Synaptics Corporation's Opposition to Plaintiff/Counterclaim Defendant Total Quality Systems, Inc.'s Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)* (*Opposition*); Dkt. 51, *Total Quality Systems, Inc.'s Reply Memorandum in Support of its Partial Motion to Dismiss* (*Reply*).

[40] Dkt. 65, *TQS's Notice of Supplemental Authority*.

[41] Dkt. 66, *Universal Synaptics' Response to TQS's Notice of Supplemental Authority* (*Response to Notice*).

[42] Dkt. 71, *Universal's Notice of Supplemental Authority*.

[43] *Minute Entry*.

## LEGAL STANDARD

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[44]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[45]  When determining whether a complaint meets these criteria, the court "accept[s] all well-pleaded factual allegations in the complaint as true, and . . . view[s] them in the light most favorable to the nonmoving party."[46]  Although a complaint "need not provide 'detailed factual allegations,' it must offer enough factual detail to provide 'fair notice of what the . . . claim is and the grounds upon which it rests.'"[47]  However, the court will not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[48]  The court is required to "draw on its judicial experience and common sense" to evaluate whether the well-pled facts state a plausible claim for relief.[49]

---

[44] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

[45] *Id.* (citing *Twombly*, 550 U.S. at 556).

[46] *Sinclair Wyoming Refining Company v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (internal quotation marks, alterations, and citations omitted).

[47] *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quoting *Twombly*, 550 U.S. at 555).

[48] *Iqbal*, 556 U.S. at 678.

[49] *Id.* at 679.

## ANALYSIS

### I.    Willful Infringement of the '475 Patent and the '826 Patent[50]

TQS seeks dismissal of Universal's causes of action for willful infringement of the '475

and '826 patents because: (1) the identified patent claims are invalid under 35 U.S.C. § 101; and

(2) Universal fails to sufficiently state a cause of action for either infringement or willful

infringement.[51]

While the sufficiency of a complaint is a "purely procedural issue" and therefore

governed by "the applicable law of the regional circuit,"[52] district courts adjudicating patent

cases apply the law of the Federal Circuit, not the regional circuit, where the question "is

intimately involved with the substance of the patent laws."[53]  Therefore, the § 101 eligibility

question is governed by Federal Circuit precedent.

#### a.  Patent Eligibility

The court first addresses the eligibility of the relevant '475 and '826 patent claims since

this is a threshold issue.  A patent and its claims are presumed valid and "[t]he burden of

---

[50] The court will use a variety of patent-specific terms in this section and includes a brief introduction to these terms to help guide the reader.  A patent "consist[s] principally of a specification that concludes with the claims."  *Perfect Curve, Inc. v. Hat World, Inc.*, 988 F. Supp. 2d 38, 43 (D. Mass. 2013).  The specification provides, among other components, a background on the relevant field, a high-level summary of the invention, and detailed descriptions of the claimed invention.  The numbered claims, which can be found at the end of a patent, define the scope of patent protection.  *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009).  "Claim" can also be used as a verb; a patent "claims" an invention.  A patent infringement cause of action alleges infringement of one or more of the numbered claims.

While acquiring a patent, the USPTO and the applicant may engage in dialogue and revisions may be necessary to acquire approval.  In particular, the USPTO will evaluate whether the patent is novel—as defined by 35 U.S.C. § 102—and nonobvious—as defined by 35 U.S.C. § 103.  *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016).  The prosecution history consists of the complete record of the proceedings before the USPTO.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

[51] *Motion to Dismiss* at 1.

[52] *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed. Cir. 2012) (citation omitted).

[53] *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012).

establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."[54]  As the party challenging the validity of the patents, TQS bears the burden of proof.

"[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts."[55]  Because eligibility under 35 U.S.C. § 101 is a question of law, this question may be resolved on a Rule 12(b)(6) motion where the facts, even when considered in the light most favorable to Universal, require a holding of ineligibility under the substantive standards of the law.[56]  "Any fact . . . that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence."[57]

35 U.S.C. § 101 defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."[58] The Supreme Court has "long held that this provision contains an important implicit exception: [l]aws of nature, natural phenomena, and abstract ideas are not patentable."[59]  This is so irrespective of whether the inventions are "[g]roundbreaking, innovative, or even brilliant,"[60] because "[laws of nature, natural phenomena, and abstract ideas] are the basic tools of scientific and technological work."[61]  "'[M]onopolization of these tools through the grant of a patent might

---

[54] 35 U.S.C. § 282.

[55] *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

[56] *See SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018) (collecting cases where § 101 eligibility has been resolved on a Rule 12(b)(6) or 12(c) motion); *Plotagraph, Inc. v. Lightricks, Ltd.*, No. 2023-1048, 2024 WL 223185, at *4 (Fed. Cir. Jan. 22, 2024) ("[D]ismissal is appropriate where the factual allegations are not plausible, are refuted by the record, or are conclusory.") (citing *Aatrix Software v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020)).

[57] *Berkheimer*, 881 F.3d at 1368.

[58] 35 U.S.C. § 101.

[59] *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

[60] *Ass'n for Molecular Pathology*, 569 U.S. at 591.

[61] *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).

tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws.'"[62]

However, courts must "tread carefully" when considering whether a § 101 exception to patentability applies because "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'"[63] Thus, "an invention is not rendered ineligible for patent simply because it involves an abstract concept."[64] Abstract concepts remain eligible for patent protection if their application is directed "to a new and useful end."[65]

To distinguish patent-ineligible claims of abstract ideas from patent-eligible claims, the Supreme Court has set forth a two-step framework for determining § 101 eligibility, known as the *Alice* inquiry.[66] At *Alice* step one, the court must decide whether the claims at issue, in their entirety, are directed to ineligible subject matter, such as an abstract idea.[67] "If not, the inquiry ends" because the claim is patent eligible.[68] But if the claims are directed to an abstract idea, then the court analyzes the claims—both individually and as an "ordered combination"—under *Alice* step two to determine whether they contain an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application."[69] In other words, the first step of the *Alice* inquiry examines "the focus of the claims, their character as a whole," and the second step

---

[62] *Alice*, 573 U.S. at 216 (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 71 (2012)).

[63] *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 71).

[64] *Id.*

[65] *Id.* (internal quotation marks and citation omitted).

[66] The framework was first established in *Mayo*, but it was in *Alice* where the Supreme Court distilled *Mayo's* analysis into a distinct two-step process. *See Alice*, 573 U.S. at 217 (discussing *Mayo*, 566 U.S. at 77–82).

[67] *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 909 (Fed. Cir. 2017) (citing *Alice*, 573 U.S. at 217).

[68] *Id.* (citations omitted).

[69] *Alice*, 573 U.S. at 217–18.

looks "more precisely at what the claim elements add—specifically, whether . . . they identify an inventive concept in the application of the ineligible matter to which (by assumption at stage two) the claim is directed."[70]

### i. The court may consider the patents and their prosecution histories.

Both TQS and Universal have relied on portions of the patents and their prosecution histories to support their briefing.  However, because the '967, '475, and '826 patents and their prosecution histories were not attached to the Amended Counterclaim, the court must evaluate whether it may properly consider these documents at Rule 12.  Traditionally, a court on a motion to dismiss must determine the sufficiency of the complaint based on its contents alone.[71]  "There are exceptions to this restriction on what the court can consider, but they are quite limited: (1) documents that the complaint incorporates by reference; (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity; and (3) matters of which a court may take judicial notice."[72]

The court concludes it may properly consider the three patents.  The Amended Counterclaim references these patents, the patents themselves are central to Universal's patent infringement claims, and neither party disputes the documents' authenticity.  Indeed, both parties rely on them in their briefs.[73]

The court may consider the prosecution histories as well.  Pursuant to Fed. R. Evid. 201(b)(2), "the court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably

---

[70] *Id.* (internal quotation marks and citations omitted).

[71] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

[72] *Wasatch Equality v. Alta Ski Lifts Co.*, 820 F.3d 381, 386 (10th Cir. 2016) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).

[73] *See, e.g.*, *Motion to Dismiss* at 7–10; *Opposition* at 15–16.

be questioned."[74]   The prosecution histories meet this requirement.  Both parties urge the court to

take judicial notice and neither disputes the accuracy of the offered selections of the prosecution

histories.[75]

### ii.   *Alice* **Step One**

Under *Alice* step one, the court "consider[s] the claims in their entirety to ascertain

whether they are directed to patent eligible subject matter."[76]  This inquiry focuses on "whether

the claims are directed to 'a specific means or method' for improving technology or whether they

are simply directed to an abstract end-result."[77]  "In conducting [the step one] inquiry, [the court]

'must focus on the language of the Asserted Claims themselves,' 'considered in light of the

specification.'"[78]  Courts must avoid "overgeneralizing claims."[79]

TQS argues all three claims are directed to abstract ideas.  As explained by TQS, Claims

1 and 8 of the '475 patent are directed to the abstract idea of detecting electrical signals, and the

patent does not provide any "specific structure indicating *how* any of these functions are

accomplished."[80]  Similarly, Claim 12 of the '826 patent is directed to the abstract idea of

mapping connection points using well known generic technology and storing the results, but

---

[74] Fed. R. Evid. 201(b)(2).

[75] The court's conclusion that it may consider the prosecution histories is further supported by other patent infringement cases, where courts use both the prosecution history and the patent to determine whether the claims are patent-eligible under § 101.  *See, e.g.*, *OIP Tech., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("Both the prosecution history and the specification emphasize that the key distinguishing feature of the claims is the ability to automate or otherwise make more efficient traditional price-optimization methods.").

[76] *Secured Mail*, 873 F.3d at 909.

[77] *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (quoting *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)).

[78] *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (quoting *Synopsys*, 839 F.3d at 1149 and *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)).

[79] *Enfish*, 822 F.3d at 1337.

[80] *Motion to Dismiss* at 9.

provides no algorithm or structure as to how any of the claimed functions or operations are to be performed.[81]

Universal responds most directly to TQS's step one arguments in a footnote in its Opposition, stating the claims "are not merely directed to the abstract idea of detecting electrical signals—they comprise unique arrangements of physical elements that embody various different new and useful operating modes, including modes for mapping test points in a system, verifying continuity within a system, detecting constant faults in a system, detecting intermittent faults in a system, simultaneously analyzing multiple concurrent signals, etc."[82]  Aside from this footnote, Universal does not directly address *Alice* step one in its briefing.  Instead, Universal encourages the court to skip the *Alice* step one analysis and proceed to step two, stating "[t]he [c]ourt does not need to consider step one of the *Alice* [] framework for determining patent eligibility if 'the claims contain alleged inventive concepts not limited to the abstract idea.'"[83]  Universal then immediately proceeds to explain what the court should examine at step two, indicating it believes the court could and should resolve the inquiry only at the second step.

In response to Universal's near complete failure to address *Alice* step one, TQS asserts "arguments raised in a perfunctory manner, such as in a footnote, are waived."[84]  In its Response to TQS's Notice of Supplemental Authority, Universal objects to TQS's waiver argument because "Universal's Opposition clearly and specifically addressed the fact that its patent claims are not merely directed to an abstract idea of detecting electrical signals under *Alice* [s]tep

---

[81] *Id.*

[82] *Opposition* at 7–8, n.3.

[83] *Id.* at 7 (quoting *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131 (Fed. Cir. 2022)).

[84] *In re C.W. Min. Co.*, 740 F.3d 548, 564 (10th Cir. 2014) (quoting *United States v. Berry*, 717 F.3d 823, 834 n.7 (10th Cir. 2013)).

[one]."[85]  In support, it cites to the footnote discussed above and to two sentences within its *Alice* step two analysis which state, "[Claims 1 and 8] claim[] an electronic device for testing electrical characteristics of a system (such as an aircraft)."[86]  Similarly, at oral argument, Universal explained it believed its brief adequately presented a step one argument, although it was intertwined with step two arguments.[87]  Universal suggested such an approach is supported by the case law.[88]

Tenth Circuit precedent is clear — arguments raised in a perfunctory manner are waived. In its Opposition, Universal identifies just three sentences addressing its *Alice* step one argument.[89]  Two of these sentences repeat with only the claim number switched and are within a section prominently titled "The Claims Contain Various Alleged Inventive Concepts – *Alice* Step

---

[85] *Response to Notice* at 1 (emphasis in original removed).

[86] *Id.* ("See Universal's Opp. (ECF No. 44) at 7–8, n.3 . . . and at 11 (explaining how Claim 1 and 8 of the '475 Patent are not directed to an abstract idea, but rather, they claim an electronic device (or apparatus) for testing an electrical system (such as an aircraft)).") (emphasis in original removed); *see also Opposition* at 11.

[87] *Minute Entry.* Universal also seemed to suggest that the court could independently see the step one argument on the face of the Amended Counterclaim and the patents without it needing to be squarely presented in the briefs. *Id.*

[88] *Id.* Specifically, Universal pointed to *Electric Power Group* and *Cooperative Entertainment* as standing for this proposition.  The court agrees that at times courts have either skipped directly to a step two analysis, such as in *Cooperative Entertainment*, or have used step two as a method to reinforce step one conclusions. *See e.g.*, *Comcast Cable Communications, LLC v. Sprint Communications Company, LP*. 203 F. Supp. 3d 499, 528 (E.D. Pa. 2016) ("The United States Court of Appeals for the Federal Circuit has recognized that the inquiries at step one and step two are intertwined and the step two analysis may reinforce a conclusion at step one."); *Blackbird Tech v. Uber Techs., Inc.*, 2020 WL 58535, at *5 (explaining that claim limitations, normally considered at step one, can be helpful during a step two analysis); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016) ("Recent cases, however, suggest that there is considerable overlap between step one and step two, and in some situations [the comprehensive analysis in search of the 'inventive concept'] could be accomplished without going beyond step one.").  It is also true that the same or similar evidence may be relevant at both step one and step two. *See Uniloc 2017 LLC v. Hulu, LLC*, No. SACV 18-2058-GW-DFMX, 2019 WL 3293293, at *4 (C.D. Cal. May 2, 2019) ("At *Alice* Step Two, Uniloc refers back to its step one analysis . . . .").  However, the court has not been able to find any precedent where a party has presented an intermingled step one and step two argument— without any explanation of the intermingled nature of the argument—and a court has parsed through the briefing to determine which arguments might apply at step one versus at step two.

[89] *United States v. Walker*, 918 F.3d 1134, 1152 ("To be sure, whether a legal argument has been adequately presented cannot be determined solely by looking at the number of words devoted to it, but it would be illogical to say that this metric is meaningless.").

Two."[90]  One sentence is in a footnote.  All contain conclusory statements that the claims are "unique arrangements of physical elements" or "an electronic device," which does not address TQS's argument that the claims are directed to abstract ideas.[91]  Universal does not cite to the patents or to the Amended Counterclaim, and it does not analogize the patents at issue here with case law.  Universal's brief instructs the court it need not consider *Alice* step one if it can resolve the issue at step two, and then seemingly presents only a step two argument.  At oral argument, Universal suggested that much of its step two analysis could apply at step one as well.[92] However, to expect the court to parse through its brief and identify the portions that could advance its step one argument would require the court to inappropriately serve as an advocate on Universal's behalf.  "[I]f [courts] refuse to 'fill the void by crafting arguments and performing the necessary legal research' for pro se litigants, that holds with even greater force for counseled litigants."[93]

Whether Universal purposefully intended to waive the step one argument or failed to address it in a way that provided adequate notice to the court and to TQS, the result is the same. Neither the court nor TQS were provided notice.  Without any meaningful argument to the contrary, the court must conclude the patent claims are directed to abstract ideas at *Alice* step one.

---

[90] *Opposition* at 7.

[91] A physical device can still be directed to an abstract idea.  *See Yu v. Apple Inc.*, 1 F.4th 1040, 1042, 1044 (Fed. Cir. 2021) (holding a claim for a physical apparatus like "an improved digital camera" can still be directed to an abstract idea).

[92] *Minute Entry*.

[93] *United States v. Moya*, 5 F.4th 1168, 1192 (10th Cir. 2021) (citing *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005)).

### iii.   *Alice* Step Two

The *Alice* inquiry does not end there.  Having concluded at step one the claims are directed to abstract ideas, the court next "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent eligible application."[94]  *Alice* step two "is satisfied when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known in the industry."[95]  The court looks for "inventive concepts" demonstrating "specific improvements . . . compared to the prior art."[96]  "The improvements in the specification, to the extent they are captured in the claims, create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities."[97]  However, the claim language itself must contain the inventive concept.[98]  The court analyzes the asserted claims "more microscopically"[99] to determine whether they capture the stated improvements.[100]

TQS addresses all three claims together, arguing they use "generic and conventional prior art items" including "inputs, a switching module, outputs, a neural network, a test meter, nodes,

---

[94] *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79); *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (explaining that under *Alice* step two, a court must scrutinize the claim elements "microscopically" to determine whether there is anything in the claims to render their subject matter patent eligible).

[95] *Berkheimer*, 881 F.3d at 1367 (internal quotation marks, internal alteration, and citations omitted).

[96] *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131 (Fed. Cir. 2022).

[97] *Berkheimer*, 881 F.3d at 1369.

[98] *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) ("The main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept.") (emphasis in original); *Eolas Techs. Inc. v. Amazon.com, Inc.*, No. 2022-1932, 2024 WL 371959, at * 6 (Fed. Cir. Feb. 1, 2024) ("But we do not see this limitation anywhere in the claims and thus it cannot satisfy *Alice* step two.").

[99] *Elec. Power*, 830 F.3d at 1354.

[100] *Berkheimer*, 881 F.3d at 1369.

pins, and circuits."[101]  These elements are common in electronics to carry out the abstract idea of

"providing signals to inputs, monitoring outputs, capturing and/or recording signals in an

electrical system."[102]  Additionally, TQS points to the specifications which state the inventions

may be used in a wide array of network computing environments, such as personal computers,

desktop computers, and mobile telephones, among others.[103]  According to TQS, this supports

the conclusion that the "only 'inventive concept' is the application of an abstract idea using

conventional and well-understood techniques," and this is not sufficient to transform the claim

"into a patent-eligible application of an abstract idea."[104]

Universal argues in turn that the USPTO Examiner's eventual allowance of all three

claims proves they are drawn to patent-eligible subject matter.[105]  This argument conflicts with

Federal Circuit precedent, which explains it is erroneous to draw this conclusion from the

USPTO's approval.  The inventive concept inquiry at the heart of *Alice* step two is not satisfied

merely because the claims "were not shown to have been anticipated by (35 U.S.C. § 102) or

obvious over (35 U.S.C. § 103) the prior art."[106]  "[S]atisfying the requirements of novelty and

non-obviousness does not imply eligibility under § 101, including under the second step of the

---

[101] *Motion to Dismiss* at 14–15.

[102] *Id.*

[103] *See, e.g., '475 Patent* col. 14 l. 47–61.

[104] *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018).

[105] *See Opposition* at 11 ("However, the fact that the examiner granted Universal a patent on claim 1 provides evidence that at least some of the elements of claim 1 were not found in the prior art, and were, therefore, not 'generic or conventional' at that time, and that the claims were drawn to patent eligible subject matter."); *id.* at 13 ("The Examiner allowed claim 8, indicating agreement that claim 8 comprised one or more inventive technical improvements over the prior art and was drawn to eligible subject matter."); *id.* at 17 ("Significantly the USPTO never objected to claim 12 . . . under 35 U.S.C. § 101.").

[106] *Synopsys*, 839 F.3d at 1151 ("But, a claim for a *new* abstract idea is still an abstract idea.  The search for a § 101 inventive concept is thus distinct from demonstrating § 102 novelty.") (emphasis in original); *see also Yu*, 1 F.4th at 1045 ("[E]ven if claim 1 recites novel subject matter, that fact is insufficient by itself to confer eligibility.") (citations omitted).

*Alice* inquiry, because what may be novel and non-obvious may still be abstract."[107]  Likewise, if USPTO approval was sufficient to demonstrate patent eligibility, the courts would never need to conduct a § 101 analysis.  While all patents must be approved by the USPTO to become a patent, not all patents are upheld by courts as patent-eligible once a § 101 analysis is undertaken.

Beyond its assertion that the USPTO's grant of the patent satisfies *Alice* step two, Universal relies heavily on *Cooperative Entertainment v. Kollective Technology*[108] to frame its response.[109]  In that case, the patent at issue related to "systems and methods of structuring a peer-to-peer (P2P) dynamic network for distributing large files, namely videos and video games."[110]  The Federal Circuit reversed the district court's dismissal based on § 101 ineligibility.[111]  Since "the claims contain[ed] alleged inventive concepts not limited to the abstract idea," satisfying *Alice* step two, the Federal Circuit concluded it did not need to address the district court's *Alice* step one analysis.[112]

Because "[t]he written description [in the patent's specification] and Cooperative's amended complaint plausibly tout[ed] [Claim 1 recitation of a particular network structure for sharing content] as an improvement to content distribution systems," the Federal Circuit held the district court erred in dismissing the complaint.[113]  The patent's specification explained how the network structure was different from and improved upon the prior art.  It identified the failures of

---

[107] *Adaptive Streaming Inc. v. Netflix*, 836 F. App'x 900, 904 (Fed. Cir. 2020) (citing *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348–49 (Fed. Cir. 2019)).

[108] 50 F.4th 127 (Fed. Cir. 2022).

[109] *Opposition* at 7–13.

[110] *Coop. Ent.*, 50 F.4th at 129.

[111] *Id.* at 130, 136.

[112] *Id.* at 131.

[113] *Id.*

the prior art[114] and clearly contrasted the patented claim with the prior art.[115]  The claim "d[id] not exist with prior art gaming or prior art audio sharing," and "save[d] time, improve[d] redundancy, and also reduce[d] or eliminate[d] costs for content delivery."[116]  The amended complaint also recited the claim's inventive concepts and distinguished itself from the prior art.[117]

### 1.  Claim 1 and 8 of the '475 Patent

Universal separately addresses the claims in the '475 patent and the '826 patent and the court follows suit.

In contrast with *Cooperative Entertainment*, where both the patent's specification and the complaint detailed "specific improvements" over the prior art, Universal relies almost exclusively on the prosecution history to demonstrate Claim 1 and 8's improvements over the prior art.  It does not point to language in the claims or in the patent specifications that explain these improvements.

Universal contends its Amended Counterclaim contains allegations touting inventive concepts.  According to Universal, "just as the Amended [Complaint] in [*Cooperative Entertainment*] included allegations related to inventive concepts of the asserted claims, Universal's Amended Counterclaim includes multiple allegations that tout the inventive concepts

---

[114] *See id.* at 132 ("The prior art fails to provide video streaming over P2P network outside the structure and control of CDNs.").

[115] *See id.* ("[The patent] describes that, in 'contrast to the prior art,' grouping peer nodes based on their simultaneous consumption of common content, such as a video or a video game, allows the 'groups of peer nodes forming the dynamic P2P networks of the present invention [to] provide for smooth playback and avoids stuttering problems or delays or buffering problems.'").

[116] *Id.*

[117] *See* Amended Complaint ¶¶ 9–25, *Coop. Ent., Inc. v. Kollective Tech., Inc.*, No. 5:20-cv-07273 (N.D. Ca), Dkt. 18.

set forth in the Asserted Claims of the '475 Patent."[118]  Universal then cites paragraphs 25–30 of

the Amended Counterclaim and argues these allege "technological improvements to the IFDIS

technology, including claims for apparatuses that have various operating modes . . . ."[119]  This

overstates the language in the Amended Counterclaim.  In relevant part the Amended

Counterclaim states only, "Brent filed another patent application for improvements he made to

the IFDIS."[120]  Unlike in *Cooperative Entertainment*, Universal's pleading does not detail

"specific improvements . . . compared to the prior art."[121]

     Universal points to the apparatuses detailed in paragraphs 27–28 of the Amended

Counterclaim as detailing improvements over the prior art.  Yet the Amended Counterclaim itself

never discusses the prior art or states these were improvements.[122]  These paragraphs better read

as a list of what is included in the patent.  This is in contrast with *Cooperative Entertainment*,

where the complaint recited the claim's inventive concepts and demonstrated its innovations.[123]

For example, the *Cooperative Entertainment*'s amended complaint identified the specific

improvements over the prior art and identified the source of the inventiveness: "According to the

prior art, the CDN server pushed the digital content from node to node.  Inventively, the '452

---

[118] *Opposition* at 9.

[119] *Id.*

[120] *Amended Counterclaim* ¶ 25.

[121] *Coop. Ent.*, 50 F.4th at 130.

[122] *See Amended Counterclaim* ¶¶ 27–28 ("This patent application disclosed and claimed an apparatus for testing connections in a system with a plurality of inputs, each of which are adapted to couple to a test point in the system under test and a switching module.  In another embodiment, the claimed apparatus also includes a meter coupled to the switching module outputs.  Different embodiments of the claimed invention relate to apparatuses that have multiple operating modes, including modes for mapping test points in a system, verifying continuity, detecting constant faults, detecting intermittent faults, analyzing multiple concurrent signals, and creating graphical representations of test points.").

[123] *See Amended Complaint* ¶¶ 9–25, *Coop. Ent., Inc. v. Kollective Tech., Inc.*, No. 5:20-cv-07273 (N.D. Ca), Dkt. 18.

patent derived 'peerness' from common video content iteratively shared in segments throughout the P2P network."[124]

Universal additionally relies on the prosecution history to show technological improvements.  According to Universal, its response to the Examiner explains "how [C]laim 1, as amended, comprised inventive technical improvements that were not disclosed or taught in the prior art."[125]  However, Universal is attempting to compare apples and oranges.  The Examiner questioned the novelty of the claim under § 102(b).  Therefore, Universal's response addressed the novelty standard, where the claim can be anticipated "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."[126]  Universal's response did not address whether Claim 1 presented an improvement, but instead whether the prior art "t[aught] or suggest[ed] each and every element of [C]laim 1."[127]  The § 101 analysis has no such requirement.  "The question therefore of whether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'"[128]

Similarly, the Examiner initially rejected Claim 8 as obvious under § 103(a), but the nonobviousness analysis is distinct from the § 101 analysis.  To satisfy § 103(a), Universal needed to demonstrate: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; and (3) the differences between the claimed invention and the prior art."[129]

---

[124] *Id.* ¶ 14.

[125] *Opposition* at 10–11.

[126] Dkt. 40, *Exhibit C: Universal's Amendment and Response After Final Office Action with Request for Continued Examination* at 9.

[127] *Id.* at 11.

[128] *Diamond v. Diehr*, 450 U.S. 175, 189 (1981) (quoting *In re Bergy*, 596 F.2d 952, 961 (Cust. & Pat. App. 1979)).

[129] *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006) (citing *Velander v. Garner*, 348 F.3d 1359, 1363 (Fed. Cir. 2003)).

Notably, an evaluation of "differences" between the claims and the prior art is distinct from an evaluation of "specific improvements" over the prior art.  A difference does not necessarily have to be an improvement.  Universal's prosecution history is not sufficient to demonstrate that claims 1 and 8 of the '475 patent were "specific improvements . . . compared to the prior art."[130]

### 2.  Claim 12 of the '826 Patent

According to Universal, Claim 12 reflects a "non-conventional and non-generic arrangement of known, conventional pieces," which the Federal Circuit has held can overcome invalidity issues.[131]  Yet Universal does not point to any specific language in the specification, the claim, or the prosecution history to establish Claim 12 reflects a "non-conventional and non-generic arrangement."  Instead, Universal relies on the USPTO's approval, asserting the claim must be directed to new, inventive elements because "the USPTO explicitly noted that 'Claims 12 and 14-6 are allowed because it is not obvious to combine the prior art of record or any combination of prior art searched to teach all the limitations of [C]laim 12 . . . .'"[132]  This incorrectly equates the USPTO's determination that Claim 12 satisfies § 103 nonobviousness with the § 101 analysis required here.

Universal also argues that Claim 12 represents an improvement over the prior art.  And, in contrast with the claims discussed above, Universal does point to language in the specification itself to demonstrate these improvements.  However, the *Alice* inquiry directs the court to "consider the elements of each claim . . . to determine whether the additional elements 'transform

---

[130] *Coop. Ent.*, 50 F.4th at 131.

[131] *Opposition* at 17 (citing *Elec. Power*, F.3d at 1355).

[132] *Id.* (citation and original emphasis removed).

the nature of the claim' into a patent-eligible application."[133]  Therefore, the claim language

itself must contain the inventive concept.  In *Two-Way Media Ltd. v. Comcast Cable

Communications, LLC*, [134] the Federal Circuit was not persuaded by an innovation that was only

described in the specification and not in the claim itself.  "The main problem that Two-Way

Media cannot overcome is that the *claim*—as opposed to something purportedly described in the

specification—is missing an inventive concept."[135]

Universal explains that Claim 12 is an improvement over the prior art because it provides

the ability to simultaneously test multiple circuits at the same time.  In support, the specification

states, "Traditional attempts to detect intermittent failures are generally performed using serial

test methods which measure ohmic continuity, one circuit at a time, even when thousands of

circuits are involved."[136]  In contrast, Universal explains, Claim 12 allows one to test multiple

circuits at once using switches connected to each connection point.

However, this innovation is not found in the claim itself.  TQS points out Claim 12

contains no language regarding testing multiple circuits "at once."[137]  The claim discusses "a

switch connected to each connection point to automatically detect interconnections on the UUT."

---

[133] *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78).  The court recognizes there is some tension between this direction and other case law from the Federal Circuit which suggests that it may be sufficient to overcome a motion to dismiss simply by alleging the innovations in the complaint.  *See, e.g.*, *Aatrix Software*, 882 F.3d at 1126–29 (holding that, after dismissing claims as ineligible, the district court erred in not allowing an amended complaint because "[t]here are concrete allegations in the second amended complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity [and] [t]here are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer."); *PASCO Sci. v. Vernier Software & Tech, LLC*, No. 3:21-CV-01523-IM, 2022 WL 2048599, at *5 n.1 (D. Or. June 7, 2022) (citing to the plaintiff's complaint to find the alleged improvements over the prior art).  However, the court must follow the instructions in *Alice* because *Alice* is binding Supreme Court precedent.

[134] 874 F.3d 1329.

[135] *Id.* at 1338 (emphasis in original); *see also Eolas Techs.*, 2024 WL 371959, at *6 ("But we do not see this limitation anywhere in the claims and thus it cannot satisfy *Alice* step two.").

[136] *'826 Patent* col. 1 l. 21–25.

[137] *Reply* at 6.

However, the court reads "automatically" as distinct from "simultaneously." Automatically is defined as "largely or wholly involuntary; acting or done spontaneously or unconsciously; done or produced as if by machine; or having a self-acting or self-regulating mechanism."[138] The interconnections could be automatically tested while still being tested one circuit at a time, as was the case in the prior art.[139] The claim language does not discuss testing occurring all at once.

Universal identifies another innovation described in the specification: "In traditional testing scenarios, detailed knowledge about the UUT is required in order to properly determine where interconnections exist in the UUT. Using the methods described herein, however, no knowledge regarding the UUT and its components is needed."[140] Once again, language describing this innovation is not found within Claim 12 itself. While Claim 12 discusses the creation of a database, there is no indication that this database does not require knowledge about the UUT or its components.[141] Because the innovations described in the specifications are not found in the claim language itself, Claim 12 does not satisfy the *Alice* step two analysis.[142]

---

[138] *Automatic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/automatic (last visited Apr. 29, 2024).

[139] *'826 Patent* col. 13 l. 54–55.

[140] *Id.* col. 10 l. 58–62.

[141] *See '826 Patent* col. 13 l. 50.

[142] The court notes that, while TQS is correct that the claim language controls, TQS's citations in support are at least partially misleading. TQS cites a portion of *ChargePoint, Inc. v. SemaConnect, Inc.* for the proposition that the claim language governs. 920 F.3d 759, 769–70 (Fed. Cir. 2019) (concluding that the claim language at issue was broader than that in the specification, requiring the court to "yield to the claim language"). However, this portion comes from the *ChargePoint*'s analysis at *Alice* step one, not step two. TQS also cites *International Business Machines Corporation v. Zillow Group, Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022). TQS argues that this case stands for the proposition that "[a]llegations and arguments about inventiveness, which are wholly divorced from the asserted claims, do not defeat a motion to dismiss." *Response* at 6. This omits a key portion of the language from the opinion itself: "[W]e do not read *Aatrix* to say that any allegation about inventiveness [in the complaint], wholly divorced from the claims *or the specification*, defeats a motion to dismiss." *Int'l Bus. Machs. Corp.*, 50 F.4th at 1379 (quoting *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019)) (emphasis added). Nevertheless, applying Federal Circuit law, the court concludes TQS has satisfied its burden.

Based on the current pleadings, the claims in the '475 patent and the '826 patent are ineligible under 35 U.S.C. § 101.  The court dismisses without prejudice Universal's fourth and fifth causes of action for willful patent infringement.[143]

## II.   Defamation

TQS seeks dismissal of Universal's claims for defamation based on the statute of limitations and due to the insufficiency of the pleadings.  Because the court determines Universal's pleadings are insufficient to sustain a claim for defamation, it does not address TQS's statute of limitation argument.

"To state a claim for defamation, [Universal] must show that [TQS] published the statements concerning [it], that the statements were false, defamatory, and not subject to any privilege, that the statements were published with the requisite degree of fault, and that their publication resulted in damage."[144]  For purposes of a Motion to Dismiss, the court accepts as true Universal's allegations that the statements at issue were false and that their publication resulted in damage.[145]

In its tenth cause of action, Universal simply alleges "TQS has published multiple false statements, including the statements published to the US Government and prospective partners regarding the IFDIS."[146]  Both TQS and the court are left to guess which statements Universal alleges are defamatory.[147]  "[F]ederal courts have consistently interpreted Fed. R. Civ. P. 8(a) as

---

[143] TQS asks the court to dismiss the patent infringement claims with prejudice.  *See Motion to Dismiss* at 16.  Generally "[a] dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."  *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006).  Here, it is not clear to the court that further amendment would be futile.

[144] *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994) (citations omitted).

[145] *Id.* at 1008.

[146] *Amended Counterclaim* ¶ 231.

[147] *See Motion to Dismiss* at 22–23 (identifying *Amended Counterclaim* ¶¶ 129–137 as the potential allegations).  At oral argument, Universal agreed these are the alleged defamatory statements.  *Minute Entry*.

requiring that defamation claims be pleaded with particularity to provide a defendant with fair notice."[148]  A defendant is not required to parse through a pleading to deduct the basis of the allegations against them.  Instead, "the language complained of must be set forth in words or words to that effect."[149]

According to Universal, its pleadings adequately "establish the content, substance, and nature of the defamation; when the defamation occurred; and who it was communicated with."[150]  However, the central issue the court must consider in a defamation claim is "whether the statements are capable of sustaining a defamatory meaning and whether any qualified or absolute privileges" apply.[151]  It is well-established by Utah courts that "[w]hether a statement is capable of sustaining a defamatory meaning is a question of law" appropriate for resolution on a Rule 12(b)(6) Motion.[152]  A statement is capable of sustaining a defamatory meaning "if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule."[153]  This analysis requires the court to "conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation."[154]  For the court to conduct

---

[148] *Rowe v. DPI Specialty Foods, Inc.*, No. 2:13-cv-00708-DN-DJF, 2015 WL 1307675, at *4 (D. Utah Aug. 20, 2015) (citing *Bushnell Corp. v. ITT Corp.*, 973 F Supp. 1276, 1287 (D. Kan. 1997); *McGeorge v. Cont'l Airlines, Inc.*, 871 F.2d 952, 955 (10th Cir. 1989); *Nogle v. Sand Canyon Corp.*, No. 12-CV-23-S, 2012 WL 4857772, at *6 (D. Wy. Oct. 11, 2012); 5 Charles Wright & Arthur Miller et al., Federal Practice and Procedure §§ 1245, 1357 (3d ed.)); *see also Celli v. Shoell*, 995 F. Supp. 1337, 1346 (D. Utah 1998) ("[F]ederal pleading standards generally require the complaint to state the specific words of the allegedly defamatory statement in order to allow the defendant to frame a responsive pleading.").

[149] *Rowe*, 2015 WL 1307675, at *3 (quoting *Dennett v. Smith*, 445 P.2d 983, 984 (Utah 1968)) (emphasis removed).

[150] *Opposition* at 32.

[151] *Id.* at 1007–08.

[152] *Id.* (citing *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988)); *see also Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014).

[153] *Cox*, 761 P.2d at 561.

[154] *O'Connor v. Burningham*, 165 P.3d 1214, 1222 (Utah 2007).

this context-driven assessment, the pleadings must identify the specific allegedly defamatory statements.  Universal's pleadings do not provide specific statements this court can evaluate to determine whether they could sustain a defamatory interpretation.  Alleging only "misrepresentations," without including the statements themselves, is not sufficiently detailed to allow the court to "conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation."[155]  Therefore, the court dismisses without prejudice Universal's tenth cause of action for defamation.

### CONCLUSION

For the foregoing reasons, TQS's Motion to Dismiss is GRANTED.[156]  Specifically, the court dismisses without prejudice Universal's fourth, fifth, and tenth causes of action.

SO ORDERED this 23rd day of May 2024.

BY THE COURT:

ROBERT J. SHELBY
Chief United States District Judge

---

[155] *O'Connor*, 165 P.3d at 1222.

[156] Dkt. 37.